UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
MICHAEL WESLEY FRIERSON-HARRIS, Ph.D.,    :
a/k/a MICHAEL WESLEY HARRIS, Ph.D.,       :
                                          :
                      Plaintiff,          :    05 CIV. 3077 (DLC)
                                          :
        -v-                               :    <u>OPINION & ORDER</u>
                                          :
Joseph C. Hough, Jr., Ph.D., as an        :
Individual and as a Co-Conspirator,       :
L. Robert Batterman, Esq., as an          :
Individual and as a Co-Conspirator,       :
Eugene Eisner, Esq., as an Individual and :
as a Co-Conspirator,                      :
David E. Frazer, Esq., as an Individual   :
and as a Co-Conspirator,                  :
John F. Fullerton, III, Esq., as an       :
Individual and as a Co-Conspirator,       :
Euan K. Cameron, Ph.D., as an Individual  :
and as a Co-Conspirator,                  :
David M. Carr., Ph.D., as an Individual   :
and as a Co-Conspirator,                  :
Ana Maria Diaz-Stevens, Ph.D., as an      :
Individual and as a Co-Conspirator,       :
John A. McGuckin, Ph.D., as an Individual :
and as a Co-Conspirator,                  :
Christopher L. Morse, Ph.D., as an        :
Individual and as a Co-Conspirator,       :
Ann B. Ulanov, Ph.D., as an Individual    :
and as a Co-Conspirator,                  :
Janet R. Walton, Ed.D., as an Individual  :
and as a Co-Conspirator,                  :
Randall H. Balmer, Ph.D., as an           :
Individual and as a Co-Conspirator,       :
Michael Maloney, as an Individual and as  :
a Co-Conspirator,                         :
Nick Zuhusky, as an Officer of Despatch   :
Moving and Storage Company, Inc., as an   :
Individual and as a Co-Conspirator, and   :
Despatch Moving and Storage Company,      :
Inc.,                                     :
                      Defendants.         :
                                          :
------------------------------------------X

Appearances:

For Plaintiff:
Michael Wesley Frierson-Harris, pro se
301 Cathedral Parkway
Apartment 6E
New York, NY 10026

For Defendants Hough, Cameron, Carr, Diaz-Stevens, McGuckin,
Morse, Ulanov, and Walton:
James E. Carroll
C. Alexa Abowitz
Cetrulo & Capone LLP
Two Seaport Lane
Boston, Massachusetts 02210

DENISE COTE, District Judge:

    Pro se plaintiff Michael Wesley Frierson-Harris, Ph.D.

("Harris"), a former professor at Union Theological Seminary

("Seminary"), brought this civil rights action against Seminary

President Joseph C. Hough, Jr., Ph.D. ("Hough"), seven Seminary

professors, Seminary attorneys L. Robert Batterman ("Batterman")

and John F. Fullerton, III ("Fullerton"), David Frazer and

another attorney who once represented Harris, a Barnard College

professor, an employee of the firm that managed Seminary

buildings, a moving company retained by the Seminary, and the

moving company's owner.  Harris filed his original complaint on

March 21, 2005 and first amended it on July 27.  Motions to

dismiss by defendants Batterman, Fullerton, and Frazer were

granted, and Harris was granted leave to amend his Section 1985

claim against Frazer.  See Frierson-Harris v. Hough, No. 05 Civ.

3077(DLC), 2006 WL 298658 (S.D.N.Y. Feb. 7, 2006); Order of

March 17, 2006.  The five Seminary professors and administrators named in the first amended complaint received an extension of time to answer that complaint and answered on September 1.  On April 14, 2006, Harris filed a motion to amend his complaint. His motion was granted, and he filed a second amended complaint on May 5, 2006.  The second amended complaint named defendants whom Harris had not previously named, as well as a defendant against whom the charges in the first amended complaint had been dismissed.  All of the defendants except one of Harris's former attorneys, who is not at issue in this Opinion, filed motions to dismiss the second amended complaint.  By Opinion and Orders of December 5, 2006 ("December Opinion and Orders"), certain claims were dismissed.  See Frierson-Harris v. Hough, No. 05 Civ. 3077(DLC), 2006 WL 3511881 (S.D.N.Y. Dec. 5, 2005); Orders of December 5, 2006.  The following claims remain following the December Opinion and Orders: (1) Section 1981 claims against Hough and Batterman; (2) Section 1985 conspiracy claims against Hough and professors Euan K. Cameron, John A. McGuckin, Janet R. Walton, Ana Maria Diáz-Stevens, Ann B. Ulanov, David M. Carr, and Christopher L. Morse (collectively, "Seminary defendants"); and (3) the New York State Human Rights Law ("NYSHRL") § 296 claim against Batterman.  The Seminary defendants move for summary judgment on all claims against them.  Their motion is granted.

Before addressing the merits of the summary judgment motion, it is necessary to describe the procedural context for the motion and Harris's objections to the entry of a decision on the motion.  Pursuant to an Order of March 21, 2006 ("March 2006 Scheduling Order"),[1] fact discovery closed on November 17, 2006, and expert discovery closed on February 23, 2007.  An Order of December 27, 2006 confirmed that the March 2006 Scheduling Order remained in effect.  Pursuant to the March 2006 Scheduling Order, Harris's opposition to this motion for summary judgment was due on April 27, 2007.  By letter dated April 25, Harris requested an extension of time to file his opposition on the grounds that he had faced delay in obtaining certification of documents from a New York State Article 78 proceeding and that he had encountered difficulties in combing through the facts and legal arguments that the Seminary defendants had asserted in support of their motion for summary judgment.  He represented that he would "be able to submit opposition papers supported by ample documentary evidence and by citation to relevant jurisprudence as mandated by the court's rules, should the court see fit to grant the enlargement."  By Order dated May 2, Harris's opposition deadline was extended to May 18, 2007.

---

[1] This date was originally set at the conference of March 17, 2006.

To this date, however, Harris has not submitted a Rule 56.1 statement, affidavits or any substantive arguments in opposition to the motion.  On May 18, he filed a document that he characterized as objections to filing opposition papers.  He argued therein that the Seminary defendants' motion should not be considered because they failed to make initial disclosures pursuant to Rule 26(a)(1), Fed.R.Civ.P., and thus rested their summary judgment arguments on evidence that they had not previously disclosed.  He also argued that the defendants had not filed timely answers to the second amended complaint.

Neither of these arguments has merit.  First, Harris had ample opportunity prior to receipt of this motion to complain that the defendants were not complying with their initial disclosure or other discovery obligations.  He did not do so, although he demonstrated an ability to communicate with the Court regarding many other matters.  Secondly, the defendants did make initial disclosures to him.  Additionally, he does not identify any specific documents or information which he requested and the Seminary defendants failed to produce.[2]

---

[2] Harris generally says that the defendants failed to make any initial disclosures and that they rely on documents that were not produced.  The defendants, in their reply, submit a copy of their initial disclosures, which include identification of every witness from whom they have submitted an affidavit save their expert, Mr. Kurre, and three defendants who were not named in the original complaint, Ana-Maria Diaz-Stevens, Ann B. Ulanov, and David M. Carr.  They state that Harris never made requests

As to Harris's second argument, he offers no theory on which Batterman's failure to respond to the second amended complaint should prevent a summary judgment motion by the Seminary defendants.[3] The Seminary defendants filed answers to the second amended complaint in February 2007.  Those Seminary defendants who had been named in the first amended complaint had filed an answer to that complaint.[4]  Regardless of whether the answers to the second amended complaint were timely filed, Harris has not previously complained about the delay.  More importantly, he had nearly three months to peruse the answers before the May 18 deadline for filing an opposition to the motion to dismiss.

The Order of May 2, 2007 clearly informed Harris that no extension of the May 18 deadline for opposing the motion for summary judgment would be granted.  The notices the Seminary defendants and this Court gave to the plaintiff explained that a

---

for production under Rule 34, for any written discovery on the Second Amended Complaint, or for any depositions.  They concede they did not send their expert report to Harris, but explain that when they asked Harris to agree to protect the confidentiality of financial information in that report, he informed them that if they sent the report to him, he would not accept it.  This assertion is supported by a letter that defense counsel sent Harris following their conversation.

[3] It is noted that Batterman filed an answer on June 28, 2007, after the date of Harris's response to the motion for summary judgment.

[4] The original complaint was never served on any defendants.

failure to submit affidavits or documentary evidence
contradicting the material facts asserted by the defendants
could result in the Court accepting the defendants' factual
assertions as true and granting judgment in the defendants'
favor without a trial.  Harris's letter of April 25 showed that
he understood his obligation to submit evidence pursuant to
Federal Rule 56 and Local Rule 56.1.  Therefore, for the
purposes of this motion, the Court treats all of the Seminary
defendants' Rule 56.1 assertions as true to the extent that they
are supported by the defendants' evidentiary submissions.  See
LeSane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 211 n.3 (2d
Cir. 2001).  The following facts are undisputed.

<u>Harris's Initial Housing Assignment</u>

The Seminary is governed by a Board of Trustees, which has
the exclusive power to hire and fire faculty and set the terms
and conditions of their employment.  The Seminary hired Harris
in April 1998.  The Seminary requires faculty to live on campus
and provides them with housing at no cost.  At the time of
Harris's hiring, the Seminary did not have a policy governing
the manner in which a newly hired professor's housing would be
chosen.  It offered Harris either of two apartments in McGiffert
Hall.  Harris requested an assignment to a different apartment,
in Knox Hall apartment 6E ("Knox 6E").  Knox 6E was ultimately
assigned to Diáz-Stevens, who had been teaching at the Seminary

for about six years.  Harris grieved his assignment in a letter
to the Chair of the Seminary's Board of Directors.

In December 1998, Harris and the Seminary resolved their
housing dispute.  As reflected in an agreement that Harris and
the Seminary executed on December 10, 1998, Harris and his
family were assigned to apartment 4W in Knox Hall ("Knox 4W").
Harris and one dependent moved into Knox 4W in early 1999.  All
of these events occurred before Hough assumed the title of
Seminary President, which occurred in July 1999.

Changes to the Ph.D. Program and Lease of Knox Hall

On September 6, 2001, in response to serious financial
difficulties, the Executive Committee of the Board of Trustees
adopted a resolution declaring that the Seminary was "in a state
of financial exigency."  Around the same time, partly in
response to the financial crisis, the faculty began the process
of changing the Ph.D. program.  Harris largely absented himself
from meetings at which the faculty discussed changes to the
Ph.D. program and curriculum.  At Hough's suggestion, the
faculty decided to decrease the number of Ph.D. candidates to be
admitted to the Seminary in order to increase the stipend
offered to each candidate.  They also changed the requirements
for Ph.D. candidates, requiring them to engage in more cross-
disciplinary study than the Seminary had previously required.

Additionally, after faculty and other members of the
Seminary community discussed various options to address the
Seminary's financial difficulties, the Seminary decided to lease
out Knox Hall, thus requiring that the faculty members living
there relocate.  According to the Seminary defendants'
accounting expert, leasing Knox Hall was a "reasonably prudent
step" for the Seminary to take to address its financial
difficulties.

Hough drafted procedures for reassigning the faculty who
would be forced to move from Knox Hall ("Reassignment
Procedures").  On November 21, 2002, the faculty voted
unanimously to approve the Reassignment Procedures.  Harris did
not attend faculty meetings during the 2002-2003 academic year.
He was on sabbatical during the vote and did not participate
even though he was living in New York at the time.  On December
5, the Seminary's Board of Trustees approved the Reassignment
Procedures.  The Reassignment Procedures provided in part that

All new apartment assignments to faculty will be made
according to the size of the apartments needed to
accommodate the number of persons in a single apartment,
including:

A.       All current faculty required to live in Union
apartments and family members, partners and
others, regardless of their relationship to the
occupant of the apartment who have been living in
the apartment for six months or more prior to
January 1, 2003 and who are continuing to live in
the apartments at the time of the required move.

9

B.         Other spouses and partners (arriving after June
           30, 2002) residing in the apartments at the time
           of the move and children or other family members
           (arriving after June 30, 2002) who meet the IRS
           test for full dependent at the time of the
           required move.

It also provided that any faculty required to live in Seminary

housing and required to relocate because of the sale or lease of

a building or the reassignment of an apartment "will be

guaranteed an apartment containing at least as many bedrooms as

there will be qualified . . . persons residing in the

apartment."  It provided that "[N]o faculty member required to

live in Union housing will be assigned to an apartment with

fewer than three bedrooms (including bedrooms used as studies or

for other purposes[)]."  Finally, it spelled out four rounds of

"[t]iebreakers" for determining priority of apartment choice

among faculty who have demonstrated needs for accommodation.

These involved the length of time that each faculty member had

held (1) "a full-time regular teaching faculty position in

accredited colleges, universities, or seminaries after receiving

a qualifying degree," (2) "a full-time regular teaching position

at Union Theological Seminary," (3) "a full-time tenured or

otherwise permanent faculty position in colleges, universities

or seminaries," and (4) "a full-time tenured or otherwise

permanent position at Union."  The Reassignment Procedures

explained that apartments that became vacant in McGiffert Hall

due to retirements or voluntary moves would be assigned first.
After all such apartments had been assigned, the Seminary would
determine whether the faculty members currently living in
McGiffert Hall apartments should remain in their apartments or
move to other apartments to accomodate faculty members being
moved from Knox Hall, based upon the factors described above.

Effective September 1, 2004, the Seminary leased space in
Knox Hall and several other buildings to Columbia University.
Hough believed that this lease was necessary to the Seminary's
survival.  The lease required that the Seminary relocate all of
the nine faculty members (and families) and who were living in
Knox Hall at the time it was signed.  In addition to Harris,
these included Hough and three other defendants in this action.
In order to begin the reassignment process, Hough asked each
faculty member to provide him with the number of persons living
in his or her apartment and to confirm information that would be
used to determine the tie breakers described by the Reassignment
Procedures.  Harris was the only faculty member who did not
comply with these requests.

Hough determined the number of people in each apartment as
provided in the Reassignment Procedures.  Hough assigned Harris
to McGiffert 321.  As of February 28, 2003, when Hough made this
assignment, there were two people living in Harris's apartment
in Knox Hall.  Although Harris and his wife have adopted

11

children since that time, Hough was not aware in February 2003
that they intended to do so.

Harris's Article 78 Lawsuit and Eviction

On or about June 10, 2003, pursuant to CPLR § 78 ("Article
78"), Harris brought suit against the Seminary's Board of
Directors in New York State Supreme Court.  He alleged that he
had been granted a license to reside in Knox 4W incident to his
employment, and that his reassignment to a new apartment and
attempted eviction from Knox 4W violated his employment contract
and a faculty employment manual.  An eviction suit that the
Seminary had brought against Harris in the New York Housing
Court ("Housing Court") was stayed during the pendency of the
Article 78 action.  The New York State Supreme Court ruled in
the Seminary's favor, and the Housing Court subsequently did so
as well, permitting the Union to evict Harris and his family
from Knox 4W.  Harris's appeals in both actions were
unsuccessful.

While these actions were pending, all other faculty members
who had been housed in Knox Hall moved voluntarily to new
apartments.  At least two faculty members, one of them a
defendant in this action, were forced to relocate from one
McGiffert apartment to another in order to accommodate faculty
moving out of Knox Hall.

12

Harris and his wife were evicted from Knox Hall on March 23, 2004.  On the evening before the eviction, Hough spoke to Harris in an attempt to gain his cooperation.  Harris told Hough he would not move and that Hough should do what he had to do. The Seminary moved Harris to Hastings Hall, apartment 219 ("Hastings 219"), because Harris had made clear he did not want to move to McGiffert Hall apartment 321 ("McGiffert 321"), and Hastings 219 was the only other available apartment.

Removal of Harris's Property

Having been moved to Hastings 219, Harris began storing his belongings in the hallway outside his apartment.  When he did not have them moved upon request, the Seminary arranged to have them moved.  When movers began taking the items, Harris called the police, who arrived on the scene and agreed with the Seminary that the items were a fire hazard.  They told Harris to move what he could into his apartment, and told the Seminary to move the rest.

The Seminary began paying for storage of Harris's property in an offsite mini-storage facility.  Between June 2004 and October 2004, McNamara wrote Harris ten letters concerning his property.  Harris did not respond, and the Seminary stopped paying for the storage.  In or around October 2004, the storage company then disposed of the Harris's belongings.

Amendment of the Faculty Guide and Harris's Termination

In 2002, the Seminary's faculty guide ("Faculty Guide") was amended by vote of the faculty, and the amendments were adopted by the Board of Trustees.  The amended guide set forth procedures for dismissal of a faculty member for "adequate cause."  It provided that adequate cause "shall consist of professional incompetence, neglect of duty or misconduct adversely affecting the fitness of the faculty member to continue to carry out his or her professional responsibilities." The dismissal process would commence with a complaint by the Academic Dean or a petition signed by a majority of the Seminary's tenured faculty.  The faculty member concerned would have an opportunity to respond in writing to the allegations against him or her, followed by a hearing and appeal.

A complaint or petition ("Petition"), dated July 5, 2005, alleged that Harris had exhibited "sub-standard academic performance," lack of collegiality, and refusal to cooperate with resolution of the Seminary's financial problems. Defendants Cameron, Walton, and Díáz-Stevens signed the Petition along with three Professors not named in Harris's federal complaint.  Defendant Morse received the Petition in his capacity as Chair of the Dispute Resolution Committee and forwarded a copy to Harris.

The Dispute Resolution Committee permitted Harris extra time to respond to the petition, but he did not submit a written response.  He also failed to attend the hearing on the Petition or to otherwise participate in the process.  The Dispute Resolution Committee prepared a report that examined in detail Harris's record at the Seminary.  The report concluded that Harris's scholarly activities were deficient for a person of his academic rank and that his "withholding of cooperation" and threats of litigation against fellow faculty members have impeded debate and "created an atmosphere of fear and apprehension on the part of his faculty colleagues that impacts, in a very real and negative way, this small community of scholars."

Harris took no appeal.  In January 2006, the Board of Trustees voted unanimously to revoke Harris's tenure and fire him for cause.  Hough was not involved in this decision, having recused himself from all process concerning the termination of Harris's employment.

As described in a letter he received immediately thereafter from the Chair of the Seminary's Board of Trustees, Harris was permitted to use his apartment at 219 Hastings Hall for a reasonable time after his termination, not to exceed February 28 and to receive a lump sum payment of $35,000.  In the event that he vacated his apartment in a timely fashion and left it in good

15

condition, he was promised an additional grant of $34,000.
Harris did not voluntarily vacate 219 Hastings Hall.  Following
proceedings in Housing Court, the Seminary evicted him on June
7, 2006.

### Allegation against Keller

Harris alleges in his second amended complaint that
Rosemary Keller ("Keller"), a tenured professor of Church
history and the Seminary's Academic Dean in 1998, told him in
March of 1998 that she "would not stand to see exceptions made
for another black man."  Harris does not allege that anyone else
heard Keller's remark.  Keller was not a decision-maker with
respect to Harris's termination or any of the other decisions
about which he complains.  Harris does not allege race-based
comments by any of the named defendants.

DISCUSSION

    <u>Section 1981</u>

    Section 1981[5] "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race. <u>Domino's Pizza, Inc. v. McDonald</u>, 126 S.Ct. 1246, 1249 (2006) (citing 42 U.S.C. § 1981(a)). In determining whether to grant summary judgment on claims brought pursuant to Section 1981 that involve disputes over defendants' motives, courts apply the Title VII <u>McDonnell-</u>

_____

[5] Section 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

_Douglas_ burden-shifting analysis.  _Gant ex rel. Gant v._
_Wallingford Bd. of Educ._, 195 F.3d 134, 146 (2d Cir. 1999)
(Section 1981); _see_ _McDonnell-Douglas Corp. v. Green_, 411 U.S.
792 (1973).  The plaintiff bears the initial burden of
establishing a _prima facie_ case of discrimination.  _Williams v._
_R.H. Donnelley, Corp._, 368 F.3d 123, 126 (2d Cir. 2004).  A
plaintiff's burden in presenting _prima facie_ evidence of
discriminatory treatment is "minimal," _McPherson v. New York_
_City Dep't of Educ._, 457 F.3d 211, 215 (2d Cir. 2006), but a
plaintiff alleging employment discrimination must nonetheless
establish that

> (1) he is a member of a protected class; (2) he is
> competent to perform the job or is performing his duties
> satisfactorily; (3) he suffered an adverse employment
> decision or action; and (4) the decision or action occurred
> under circumstances giving rise to an inference of
> discrimination based on his membership in the protected
> class.

_Dawson v. Bumble & Bumble_, 398 F.3d 211, 216 (2d Cir. 2005).
"When plaintiffs seek to draw inferences of discrimination by
showing that they were "similarly situated in all material
respects" to the individuals to whom they compare themselves,
"their circumstances need not be identical, but there should be
a reasonably close resemblance of facts and circumstances."
_Lizardo v. Denny's, Inc._, 270 F.3d 94, 101 (2d Cir. 2001)
(citation omitted) (Section 1981).

If the plaintiff succeeds in making this prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason that motivated the adverse employment action.  McPherson, 457 F.3d at 215-16.  The defendant's burden is "one of production, not persuasion."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  If the defendant meets this burden, it "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006).  The court examines "the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder of a central element of a 1981 claim: namely, that defendants intentionally discriminated against them on the basis of their race."  Lizardo, 270 F.3d at 103.

Harris has failed to make even a prima facie showing that the termination of his employment or any of the other actions of which he complains occurred under circumstances giving rise to an inference of racial discrimination.  He attributes a single racially discriminatory remark to Keller, but she is not a defendant.  There is no evidence that she made the remark in front of any of the defendants or that she made any of the decisions at issue in this litigation.  The record also lacks evidence that any of the professors who were not fired or who

otherwise received better treatment than Harris were similarly situated to him.  The evidence would not, for example, support any finding that they were similarly situated in terms of their academic records and interactions with fellow faculty (as relevant to the termination claim), the number of household members they disclosed to the Seminary and their seniority (as relevant to the housing claims), or their storage of personal belongings (as relevant to the removal of property claim).  Cf., e.g., Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64-65 (2d Cir. 1997) (finding that other employees were not similarly situated to plaintiff because she had not provided evidence that they engaged in similar misconduct).  Therefore, summary judgment is granted to the Seminary defendants on the Section 1981 discrimination claim.[6]

Section 1985

    As discussed in the Opinion and Order of February 7, 2006,

---

[6] Although the defendants argue in their opening memorandum that Harris cannot support a Section 1981 retaliation claim, it is not necessary to address that issue because Harris's second amended complaint does not plead a retaliation claim.  The section of the complaint to which defendants refer in their retaliation argument discusses the Harris family's eviction following the Article 78 and housing court proceedings, but Harris alleges that the eviction and other adverse actions were the result of racial discrimination, not retaliation for protected activities.

Section 1985 bars conspiracies to violate civil rights.[7] <u>Webb v. Goord</u>, 340 F.3d 105, 110 (2d Cir. 2003). . . . "[I]n order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." <u>Id.</u> (citation omitted).

<u>Frierson-Harris v. Hough</u>, No. 05 Civ. 3077 (DLC), 2006 WL 298658, at *5 & n.2 (S.D.N.Y. Feb. 7, 2006).  The evidence

---

[2] Section 1985 provides, in relevant part:

> (2) Obstructing justice; intimidating party, witness, or juror
>
> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . ; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;
>
> (3) Depriving persons of rights or privileges
>
> If two or more persons in any State or Territory conspire . . . , for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985.

submitted on this motion could not reasonably establish any

agreement to achieve unlawful ends.  Therefore, summary judgment

is granted on all claims brought pursuant to Section 1985.


CONCLUSION

The Seminary defendants' motion for summary judgment is

granted.  The only remaining claims in this case are the Section

1981 and NYSHRL Section 296 claims against Batterman, who has

not moved for summary judgment.

SO ORDERED:

Dated:    New York, New York
          August 24, 2007

DENISE COTE
United States District Judge

22

COPIES SENT TO:

Dr. Michael Wesley Frierson-Harris
301 Cathedral Parkway
Apt. 6E
New York, NY 10026

A. Michael Furman
Jeffrey Keliner
Kaufman Borgeest & Ryan LLP
99 Park Avenue
New York, NY 10016

Howard Z. Robbins
Proskauer Rose LLP
1585 Broadway
NY NY 10036-8299

James Edward Carroll
C. Alexa Abowitz
Cetrulo & Capone, LLP
Two Seaport Lane
Boston, MA 02210

Sally Otos
Eisner & Associates
113 University Place
8th Floor
New York, NY 10003-4588